IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TIFFANY ARNOLD,                    :
                                   :
         Plaintiff,                :
                                   :
      v.                           :      3:13-cv-02196
                                   :
CAROLYN W. COLVIN, ACTING          :      Hon. John E. Jones III
COMMISSIONER OF SOCIAL             :
SECURITY,                          :
                                   :
         Defendant.                :

**MEMORANDUM**

**October 20, 2014**

**Introduction**

Plaintiff Tiffany Arnold has filed this action seeking review of a decision of

the Commissioner of Social Security ("Commissioner") denying Arnold's claim

for supplemental security income benefits.

Arnold protectively filed her application for supplemental security income

benefits on June 18, 2009, alleging that she became disabled on January 31, 2007.

Tr. 18. [1]  Arnold has been diagnosed with several impairments, including: bipolar

disorder, an anxiety-related disorder, borderline personality disorder, Hepatitis C,

Lyme disease, bilateral shoulder impingement status post-surgical correction, and a

---

[1] References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of
the Defendant's Answer.

history of polysubstance abuse and dependence.  Tr. 20-21.  On January 4, 2010,

Arnold's application was initially denied by the Bureau of Disability

Determination.  Tr. 100.

Hearings were conducted by an administrative law judge ("ALJ") on

November 10, 2010 and June 16, 2011, where Arnold was represented by counsel.

Tr. 43-69, 72-97.   On June 22, 2011, the ALJ issued a decision denying Arnold's

application.  Tr. 18-34.  On July 26, 2013, the Appeals Council declined to grant

review.  Tr. 1.  Arnold filed a complaint before this Court on August 20, 2013.

Supporting and opposing briefs were submitted and this case became ripe for

disposition on March 2, 2014 when Arnold filed a reply brief.

Arnold appeals the ALJ's determination on four grounds: (1) the ALJ erred

in finding that borderline personality disorder was not a medically determinable

impairment, (2) the ALJ violated regulations concerning the analysis of substance

abuse disorders, (3) the ALJ did not properly evaluate the available medical

opinions, and (4) the vocational expert's testimony did not constitute substantial

evidence at step five.  For the reasons set forth below, the decision of the

Commissioner is affirmed.

## **Statement of Relevant Facts**

Arnold was twenty-eight years of age on the date the ALJ rendered his

decision; she has a high school education, and is able to read, write, speak, and

understand the English language.  Tr.  46, 49, 249.  The ALJ found that Arnold did

not have any past relevant work.  Tr. 32.

A.    **Arnold's Mental Impairments**[2]

On January 8, 2007, just prior to the relevant period, Arnold presented to

Girard Medical Center for inpatient mental health treatment.  Tr. 312.  Arnold

complained of insomnia, intermittent suicidal ideation without intent, and anxiety

attacks.  Tr. 315.  Upon admission, Arnold was cooperative and fully oriented, had

good eye contact, a goal-direct thought process, and no hallucinations.  Tr. 316.

She had an anxious affect, as well as adequate memory and insight, but poor

judgment.  Id.  Arnold had a GAF score of 20-30.[3]  Tr. 317.  She was discharged

from inpatient treatment on January 24, 2007.  Tr. 312.  At discharge, Arnold was

diagnosed with major depressive disorder and borderline personality disorder, and

was assigned a GAF score of 35-40.[4]  Tr. 312, 318.

After receiving little treatment for her mental illnesses for a period of more

than two years, on May 16, 2009, Arnold voluntarily presented for inpatient mental

---

[2] Though Arnold has been diagnosed with several physical impairments, her appeal concerns only her mental impairments and issues surrounding her substance abuse. Thus, records relating to Arnold's physical impairments will only be discussed as necessary to evaluate the relevant issues on appeal.

[3] A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed., Text rev., 2000).  A GAF score of 11 to 20 represents some danger of hurting self or others, or occasionally failing to maintain minimal personal hygiene, or gross impairment in communication. Id.

[4] A GAF score of 31-40 signifies "some impairment in reality testing or communication ... or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood." Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed., Text rev., 2000).

health treatment.  Tr. 342.  Arnold reported increased depression and suicidal

thoughts following several stressful events, including her grandfather's suicide, the

death of a friend, and being fired from her job.  Tr. 342-43.  Arnold also reported

relapsing on drugs that month after being sober for a significant amount of time;

she was assigned a GAF score of 30.  Tr. 342-43.  Upon discharge on May 18,

2009, Arnold's affect was "somewhat" restricted and her mood was variable.  Id.

She was diagnosed with bipolar disorder without psychotic features, panic

disorder, heroin abuse, and cocaine abuse.  Tr. 342.  Arnold's GAF score had

improved to 50.[5]  Tr. 343.

Arnold returned to inpatient treatment on May 19, 2009 with continuing

suicidal thoughts.  Tr. 349.  On admission, Arnold had poor insight and judgment,

as well as paranoid thoughts and tactile hallucinations although a full mental status

examination was not possible due to her sedated state.  Tr. 350.  It was noted that

Arnold was abusing benzodiazepines.  Id.  Arnold was discharged on June 1, 2009

with a "somewhat constricted" affect, a "somewhat anxious" mood, and no suicidal

or homicidal ideation.  Tr. 351.  Arnold's GAF score was 49.  Tr. 349.

On June 1, 2009 after being discharged from inpatient treatment, Arnold was

admitted to Bowling Green Brandywine for substance abuse treatment.  Tr. 1121-

---

[5] A GAF score of 41–50 is indicative of "serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed., Text rev., 2000).

1131.  At that time, Arnold was cooperative with an appropriate affect and calm

mood; she had normal motor activity and no memory problems.  Tr. 1125.  Arnold

was alert and oriented, had relevant speech, moderate insight into her problems,

and adequate judgment.  Id.  Her thought content and processes were within

normal limits, and she denied hallucinations or delusions.  Id.

At a psychiatric evaluation on June 3, 2009, Arnold reported manic states,

racing thoughts, irritability, and poor sleep.  Tr. 1132.  Arnold's behavior was

"highly med-seeking" and she was an unreliable historian, though she had fair

recent memory.  Tr. 1132-33.  Arnold made good eye contact, had slightly

pressured speech, a depressed mood, an irritable affect, and her thought processes

were "linear but slightly circumstantial."  Tr. 1132.  She had poor insight and

judgment, and was diagnosed with opiate dependence, cocaine abuse, and mood

disorder with a GAF score of 60.[6]  Tr. 1133.

On January 20, 2009, Arnold presented to Anne Dall, M.D. for a psychiatric

evaluation.  Tr. 645-47.  Arnold reported anhedonia, anxiety, and panic symptoms;

she denied suicidal or homicidal ideation, and denied feelings of hopelessness or

helplessness.  Tr. 645.  Arnold reported being "clean" from drugs, but also

admitted that she was not taking any of her medications except for Seroquel.  Tr.

---

[6] A GAF score between 51 and 60 indicate moderate symptoms (e.g., circumstantial speech and occasional panic attacks or moderate difficulty in social or occupational functioning as evidenced by ... conflicts with peers or coworkers).  Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed., Text rev., 2000).

646.  She was cooperative, oriented, neatly groomed and dressed, and made good eye contact.  Id.  Arnold's affect was constricted, but she had no psychomotor agitation or retardation.  Id.

Dr. Dall noted that Arnold's immediate and short term memory was "intact to register" and she was able to recall three out of three words after one minute, and again after five minutes.  Id.  However, Arnold's remote memory for life events "was patchy in places."  Id.  Dr. Dall found that Arnold's concentration was intact; she was able to spell "world" backwards and forwards, and was able to subtract serial 7's backward from one hundred to seventy-nine without error.  Id.  Arnold's abstract thinking was intact, she had good insight, fair impulse control, and intact judgment.  Id.  Dr. Dall diagnosed Arnold with bipolar II disorder and polysubstance abuse in remission, and assigned a GAF score of 53.  Tr. 647.

Arnold returned to Dr. Dall on May 14, 2010 and reported that she had stopped taking her medications "because they were not helpful."  Tr. 1048.  Arnold had a "rather angry" affect, but made good eye contact, had an organized thought process, intact cognition, and normal speech.  Id.  Her GAF score remained 53.  Id.  By July 20, 2010, Arnold's affect had improved and become "fairly bright."  Tr. 1046.  She reported mood swings and depression, but a mental status examination was normal.  Id.  Her GAF score improved to 55, and Dr. Dall diagnosed Arnold with bipolar disorder and polysubstance abuse in remission.  Id.

On August 28, 2010, Arnold presented to the White Deer Run Behavioral Health System for drug rehabilitation, where she remained until September 30, 2010.  Tr. 1055.  During her treatment, Arnold complained of depression and bipolar disorder, and it was noted that her mental impairment symptoms were present even during periods of sobriety.  Tr. 1068.  Arnold was calm and cooperative, she had an appropriate affect, relevant speech, and had normal motor activity and no memory problems.  Tr. 1069.  She had moderate insight into her problems, no hallucinations or delusions, adequate judgment, and her thought content and processes were within normal limits.  Id.  Arnold was diagnosed with opioid dependence, cannabis dependence, generalized anxiety disorder, depressive disorder, and a history of post-traumatic stress disorder.  Tr. 1056.  During her treatment, Arnold was assessed a GAF score of 45-51.  Tr. 1086.

After her discharge from White Deer Run, Arnold returned to Dr. Dall on October 5, 2010.  Tr. 1097.  Arnold complained of ongoing anxiety, poor motivation and energy, and mood swings.[7]  Id.  Arnold had a bright affect and her mental status examination was normal.  Id.  Dr. Dall listed Arnold's polysubstance dependence as no longer being in remission, and assigned a GAF score of 54.  Id.  On November 22, 2010, Arnold reported that she had begun using lamictal and felt her mood was becoming more stable.  Tr. 1142.  Arnold's mental status

_____

[7] Despite complaining of mood swings, the day prior to this visit, Arnold denied mood changes. Tr. 1113-14.

examination was normal and she had a bright affect.  Id.  Dr. Dall diagnosed

Arnold's polysubstance dependence as being in remission and assessed a GAF

score of 55.  Id.

On December 29, 2010, Arnold reported that her mood remained stable

since beginning lamictal.  Tr. 1144.  Her mental status examination remained

unchanged, as did her diagnoses.  Id.  Dr. Dall assigned a GAF score of 57.  Id.  On

April 11, 2011, Arnold reported to Dr. Dall for the final appointment contained

within the administrative record.  Tr. 1184.  Arnold complained of anxiety, racing

thoughts, and difficulty sleeping.  Id.  She did note that her depression was

"improving a little bit," but admitted that she had run "out of her lamictal and

zolpidem."  Id.  Arnold's diagnoses remained unchanged, and she was assessed a

GAF score of 55.  Id.

### B.    Residual Functional Capacity Assessments

On July 29, 2009, Robert Barton, M.D., Arnold's treating physician,

completed a residual functional capacity assessment.  Tr. 441-43.  Dr. Barton

opined that Arnold was slightly impaired in her ability to: (1) understand,

remember, and carry out detailed instructions; (2) remember locations and work-

like procedures; (3) sustain an ordinary routine without special supervision; (4)

make simple work-related decisions; (5) interact appropriately with the general

public; (6) respond appropriately to changes in the work setting; (7) be aware of

normal hazards and take appropriate precautions; (8) travel in unfamiliar places and use public transportations, and; (9) set realistic goals and make plans independently of others.  Id.

Dr. Barton further opined that Arnold was moderately limited in her ability to: (1) understand, remember, and carry out very short and simple instructions; (2) ask simple questions or request assistance, and; (3) maintain social appropriate behavior and adhere to basic standards of neatness and cleanliness.  Tr. 441-42.  Dr. Barton also believed that Arnold was likely to miss four or more days of work on average each month.  Tr. 442.  He also opined that alcohol or substance abuse had no impact on Arnold's symptoms and limitations.  Tr. 443.

On December 9, 2009, Arnold was consultatively examined by Louis Laguna, Ph.D., who then completed a mental residual functional capacity assessment.  Tr. 639-30, 632-37.  Arnold reported an inability to concentrate, perseverative thoughts, and manic-depressive mood swings.  Tr. 633.  She reported bipolar episodes approximately two to three times per year.  Tr. 635.  Arnold was cooperative, anxious, and was "quite hyper at times during the interview."  Tr. 633, 635.  Her productivity, continuity and language were all intact.  Tr. 636.

She was able to think abstractly as evidence by her ability to interpret simple proverbs.  Id.  Arnold had a good capacity for calculating serial 3's, her recent past, and remote memory were intact, she had fair insight and judgment, and her

impulse control only became "a problem" when she was manic.  Id.  Dr. Laguna

diagnosed Arnold with bipolar I disorder, heroin addiction in remission, and

borderline personality disorder.  Tr. 636-37.  Dr. Laguna assigned a GAF score of

45.  Tr. 637

Dr. Laguna opined that Arnold was moderately limited in her ability to

respond appropriately to work pressures in a usual work setting and respond

appropriately to changes in a routine work setting.  Tr. 629.  He believed that

Arnold was only slightly limited in her ability to interact appropriately with the

public, with co-workers, and with supervisors.  Id.

On December 20, 2009, Salvatore Cullari, Ph.D. reviewed Arnold's medical

records and offered a mental residual functional capacity assessment.  Tr. 896-912.

Dr. Cullari opined that Arnold was moderately limited in her ability to: (1)

understand, remember, and carry out detailed instructions; (2) maintain attention

and concentration for extended periods; (3) accept instructions and respond

appropriately to criticism from supervisors, and; (4) set realistic goals or make

plans independently of others.  Tr. 896-97.  Dr. Cullari believed that the medical

evidence did not establish the existence of Paragraph C criteria.  Tr. 911.  He also

opined that, in terms of Paragraph B criteria, Arnold had mild difficulties in her

activities of daily living, moderate difficulties with social functioning, mild

limitations in her concentration, persistence, or pace, and no episodes of decompensation.  Tr. 910.

Dr. Cullari opined that Arnold could be expected to remember simple one or two step instructions, and was able to perform simple, routine work in a stable environment.  Tr. 898.  He further believed that Arnold could make simple decisions, carry out very short and simple instructions, and function in a production oriented job with little independent decision-making.  Id.  Finally, he opined that Arnold is able to interact appropriately with the general public and sustain an ordinary routine without special supervision.  Id.

On May 5, 2010, Dr. Dall completed a mental residual functional capacity assessment.  Tr. 966-67.  Dr. Dall believed that Arnold had a fair ability to: (1) remember locations and work-like procedures; (2) understand, remember, and carry out short, simple instructions; (3) understand, remember, and carry out detailed instructions; (4) sustain an ordinary routine without special supervision; (5) work with or near others without being distracted by them; (6) complete a normal workday or workweek; (7) perform at a consistent pace; (8) ask simple questions or request assistance (9) accept instructions and respond appropriately to criticism from supervisors; (10) get along with co-workers and peers; (11) maintain socially appropriate behavior, and; (12) respond appropriately to changes in the work setting.  Id.

Dr. Dall opined that Arnold had a poor ability to: (1) maintain attention and concentration for extended periods; (2) perform activities within a schedule, maintain regular attendance, and be punctual; (3) make simple work-related decisions, and; (4) interact appropriately with the public. Id. Dr. Dall opined that Arnold's mental and physical impairments would adversely affect her attendance, making it "highly unlikely that she could consistently attend work." Tr. 967.

C.    **The Administrative Hearing**

At Arnold's November 10, 2010 administrative hearing, she testified that her depression caused suicidal thoughts. Tr. 59. Approximately twice per week Arnold would not want to get out of bed. Tr. 63. Arnold stated that she had severe mood swings where she would be "up" for a couple of hours before crashing. Tr. 59. Arnold testified that she had good days and bad days, and stated that her medication was only partially effective. Tr. 60. Arnold also testified that she suffered from anxiety attacks where she would be unable to breathe, would shake, and would have pain in her chest. Id. She also became anxious around ten or more people. Id. Arnold stated that she had used heroin once in August 2010, but prior thereto had been clean for approximately two years. Tr. 56.

At the second administrative hearing, conducted on June 16, 2011, Paul Anderson, an impartial vocational expert, was called to give testimony. Tr. 89. The ALJ asked Dr. Anderson to assume a hypothetical individual with Arnold's

12

age, education, and work experience who was limited to light work[8] but could not reach above shoulder level, could not lift objects above table height, and could not be exposed to hazards. Tr. 90-91. The ALJ further limited the individual to simple, routine tasks that involved only simple one and two-step instructions with only incidental public contact. Tr. 91.

Dr. Anderson opined that, given these restrictions, the hypothetical individual would be capable of performing two representative jobs that exist in significant numbers in the national economy: a surveillance system monitor and a bakery worker. Tr. 94. Dr. Anderson stated that, if given sufficient time, he would be able to identify other jobs that fit the hypothetical. Tr. 95. Dr. Anderson further testified that an individual would be unable to maintain substantially gainful employment if she missed more than two days of work per month. Id.

**Discussion**

In an action under 42 U.S.C. § 405(g) to review the Commissioner's decision denying a plaintiff's claim for disability benefits, the district court must uphold the findings of the Commissioner so long as those findings are supported

---

[8] Light Work is defined by the regulations of the Social Security Administration as work "with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 416.967.

by substantial evidence.  Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  In an adequately developed record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.  Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203 (3d Cir. 2008).

Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims.  See 20 C.F.R. § 404.1520; Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 91-92 (3d Cir. 2007).  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy.  See 20 C.F.R. § 404.1520.   The initial burden to prove disability and inability to engage in past relevant work rests on the claimant; if the claimant meets this burden, the burden then shifts to the Commissioner to show that a job or jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  Mason, 994 F.2d at 1064.

A.     **Borderline Personality Disorder Diagnosis**

On appeal, Arnold argues that the ALJ erred in finding that borderline personality disorder was not a medically determinable impairment, despite Dr.

Laguna diagnosing Arnold with that impairment.  The Commissioner argues that, even if the ALJ erred, such error was harmless.

At step one, a claimant must present "evidence consisting of signs, symptoms, and laboratory findings" establishing the existence of a medically determinable impairment.  20 C.F.R. § 404.1508.  No symptom or combination of symptoms alone can establish the existence of a medically determinable impairment.  SSR 96-4p.  "Signs are anatomical, physiological, or psychological abnormalities which can be observed, apart from [an individual's symptoms] . . . [p]sychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception."  20 C.F.R. § 404.1528.

The ALJ rejected borderline personality disorder as a medically determinable impairment for several reasons.  Tr. 20-21.  The ALJ reasoned that Arnold had only been diagnosed with borderline personality disorder once during the relevant period.  Tr. 20.  Furthermore, none of Arnold's treating physicians had diagnosed her with borderline personality disorder during that period, and Arnold had not received any treatment directed at borderline personality disorder.  Id.

These are all valid reasons to find that borderline personality disorder was not a medically determinable impairment.  The fact that Arnold was only diagnosed with this impairment once during the relevant period, by a consultative

examiner based on a single examination, undercuts any claim that this "impairment" satisfied the durational requirements of Title II.  <u>See</u>, SSR 96-4p. Additionally, Dr. Laguna's own records do not include psychiatric signs sufficient to support a finding that borderline personality disorder is a medically determinable impairment.  Most of the psychiatric signs discussed by Dr. Laguna were normal; Arnold's memory was intact, her insight and judgment were fair, and she was able to think abstractly.  Tr. 636.

Even if the ALJ did err, such error would be harmless.  The ALJ thoroughly reviewed and discussed all evidence contained within the administrative record as it related to Arnold's mental impairments.  Tr. 20-32.  The ALJ analyzed all of Arnold's alleged symptoms, all objective findings, the GAF scores assessed by Arnold's treating physicians, and the diagnoses provided by all physicians.  <u>Id.</u> Importantly, the ALJ also assessed Dr. Laguna's opinion and findings and provided valid reasons for according "limited weight" to that opinion.  Tr. 20, 30. To the extent that Arnold had any symptoms or limitations relating to borderline personality disorder, the ALJ considered those symptoms in the broad context of Arnold's overall mental health.  Additionally, the ALJ provided for only incidental contact with the public, which would help accommodate any issues that Arnold had in interpersonal relationships.  Tr. 25.  Consequently, there is no indication that

this alleged error affected the outcome of the ALJ's decision, and remand is not warranted.  See, Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005).

B.     **The ALJ's Findings Regarding Substance Abuse**

Arnold next argues that the ALJ violated social security regulations relating to substance abuse.  Specifically, Arnold argues that the ALJ failed to determine whether substance abuse was a contributing factor to Arnold's disability.  Arnold further argues that the ALJ used drug abuse to "brush off" other mental impairments.

Where a claimant is diagnosed with substance abuse, the ALJ must first determine whether the claimant is disabled taking into account all impairments, including substance abuse.  See, 20 C.F.R. § 416.935; Martin v. Comm'r of Soc. Sec., 547 F.App'x 153, 156 (3d Cir. 2013).  If the ALJ determines that the claimant is disabled, only then will the ALJ consider whether substance abuse is material to the claimant's disability.  Id.

In this instance, the ALJ did not err in his analysis of Arnold's substance abuse.  Consistent with applicable rules and regulations, the ALJ considered all impairments, including substance abuse, in conducting the five step sequential evaluation process.  Tr. 20-33.  The ALJ ultimately concluded that, even accounting for Arnold's substance abuse, she was not disabled within the meaning of the Social Security Act.  Tr. 33.  As a result, the ALJ was not required to

18

consider whether substance abuse was "material."  20 C.F.R. § 416.935.

Contrary to Arnold's arguments, the ALJ did account for her substance abuse impairment, and not err in finding that substance abuse was not severe impairment.[9]  The ALJ first considered substance abuse at step two when he concluded that it was not a severe impairment.  Tr. 21.  The ALJ noted that, though Arnold was hospitalized during the relevant period due to substance abuse, during periods of sobriety Arnold did not report any significant limitations secondary to substance abuse.  Tr. 21, 24.

The ALJ again addressed substance abuse in crafting a residual functional capacity at step four.  Tr. 26-27.  The ALJ noted that, though Arnold required intensive services during two brief periods of drug abuse, during periods of sobriety Arnold "demonstrate[d] improved and stable functioning with minimal medication management and outpatient treatment[.]"  Tr. 27.

The ALJ's conclusion in this respect is supported by the administrative record as a whole.  During periods of sobriety, Arnold's GAF scores never dropped below 53, indicative of moderate symptoms.  Tr. 647, 1046, 1048, 1097, 1133, 1142, 1144, 1184.  Arnold's mental status examinations were mostly normal; her only mental health related check-ups were for medication management, and she did not seek continuing treatment for substance abuse.  Id.  Significantly, Arnold's

_____

[9] An ALJ's failure to find an impairment "severe" is harmless so long as they ALJ found at least one severe impairment at step two.  See, Rutherford, 399 F.3d at 553.

19

own treating physician, Dr. Barton, opined that drug or alcohol abuse did not

contribute to Arnold's symptoms or functional limitations.  Tr. 443.  Additionally,

physicians at White Deer Run also noted that Arnold's symptoms were present

even during periods of sobriety.  Tr. 1068.  Thus, the ALJ properly accounted for

Arnold's substance abuse throughout the five step process, and did not err in his

analysis of Arnold's substance abuse.

> C.   **The ALJ's Evaluation of the Treating Physician Opinions**

Arnold further contends that the ALJ erred in rejecting the opinion of her

treating physician, Dr. Dall.[10]  Arnold asserts that the ALJ rejected Dr. Dall's

opinion based solely on his own lay opinion.  The Commissioner responds that the

ALJ properly accorded less weight to Dr. Dall's opinion because it was conclusory

and contradicted by the other evidence contained within the administrative record.

The United States Court of Appeals for the Third Circuit has recognized a

preference for the treating physician's opinion.  See, e.g., Morales v. Apfel, 225

F.3d 310, 316-18 (3d Cir. 2000).  When the treating physician's opinion conflicts

---

[10] Arnold makes passing reference to the opinion of Dr. Barton, without elaborating how the ALJ
erred in evaluating this opinion.  The ALJ gave little weight to Dr. Barton's opinion because,
*inter alia*, it was "internally quite inconsistent[.]"  Tr. 31.  This reason alone was sufficient to
reject Dr. Barton's opinion given the numerous inconsistencies contained within his opinion.
For example, Dr. Barton opined that Arnold was slightly impaired in her ability to understand,
remember, and carry out detailed instructions, but paradoxically opined that she was moderately
impaired in her ability to understand, remember, and carry out simple instructions.  Tr. 441-42.
Similarly, Dr. Barton opined that Arnold would likely miss more than four days of work each
month, but asserted that she could generally maintain regular attendance and be punctual within
customary tolerances.  Id.  Dr. Barton asserted that those limitations had existed for ten years, but
based his assertions on Arnold's four years of care for mental impairments.  Tr. 442, 444.

with a non-treating, non-examining physician's opinion, the administrative law judge may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Id. at 317 (quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).  In choosing to reject the evaluation of a treating physician, an administrative law judge may not make speculative inferences from medical reports and may reject treating physician's opinions outright only on the basis of contradictory medical evidence and not on the basis of his or her own credibility judgments. Id. (citations omitted).

Here, the ALJ did not rely upon lay opinion, and properly noted that Dr. Dall's opinion was inconsistent with other evidence contained within the administrative record, including her own treatment notes.  As an initial matter, the ALJ did not err in finding that Arnold's GAF scores of 53 or higher, indicative of only moderate symptoms, was inconsistent with Dr. Dall's opinion that Arnold was severely limited in at least some of her functional abilities.

While GAF scores are not dispositive of the issue of disability, they are instructive of the physician's opinion regarding the severity of an individual's mental impairments.  Furthermore, GAF scores indicating moderate symptoms are inconsistent with an opinion that that claimant is severely limited in her functional abilities. See, Grogan v. Comm'r of Soc. Sec., 459 F.App'x 132, 139 (3d Cir. 2012) (finding that GAF scores indicative of moderate to mild symptoms is

inconsistent with an opinion that the claimant suffers from severe and extreme limitations); Becker v. Comm'r of Soc. Sec., 403 F.App'x 679, 686 (3d Cir. 2010) (GAF scores indicative of moderate symptoms is inconsistent with an opinion that a claimant had marked limitations); Morris v. Barnhart, 78 F.App'x 820, 824 (3d Cir. 2003) (An opinion that the claimant had marked limitations is inconsistent with GAF scores indicating moderate symptoms).

Additionally, Dr. Dall's opinion was inconsistent with other evidence contained within the administrative record, including her own treatment records. Dr. Dall opined that Arnold had a poor ability to maintain attention and concentration for extended periods of time.  Tr. 966.  However, only months prior to offering this opinion, Dr. Dall noted that Arnold's concentration was intact.  Tr. 646.  She further noted that Arnold was able to perform serial 7's backwards and spell the word "world" forward and backward.  Id.  Similarly, Dr. Laguna did not believe that Arnold's concentration was impaired, and noted a "good capacity" for performing serial 3's.  Tr. 636.

Dr. Dall further opined that Arnold had a poor ability to make simple work-related decisions.  Tr. 966.  However, Dr. Dall previously observed that Arnold had intact judgment, good insight, above average intelligence, intact memory, and an ability to think abstractly.  Tr. 646.  Dr. Dall consistently noted that Arnold's cognition was intact and her thought processes were organized.  Tr. 1046, 1097,

1142, 1144, 1184.  These treatment notes were consistent with treatment records from other physicians that indicated Arnold had normal motor activity, no memory problems, normal thought processes, and adequate judgment.  Tr. 1069, 1125.

Finally, the ALJ noted that Arnold's treatment generally consisted only of "minimal medication management and outpatient treatment[.]"  Tr. 27, 30.  The ALJ believed that, if Arnold were as limited as Dr. Dall opined, one would expect to see a greater level of "consistent outpatient treatment other than psychotropic medication management[.]"  Tr. 27.  During the period following Arnold's substance abuse rehabilitation in September 2010 until April 2011, a period of approximately seven months, Arnold's only mental health treatment consisted of four medication management appointments with Dr. Dall, each lasting a mere twenty minutes.  Tr. 1097, 1142, 1144, 1184.  This minimal level of treatment, coupled with the other inconsistencies in Dr. Dall's opinion, reinforced the conclusion that Dr. Dall's opinion was inconsistent with the administrative record as a whole.

The ALJ was presented with differing opinions, two indicating that Arnold was severely limited in her functional abilities, and two indicating that Arnold had only mild or moderate limitations.  Tr. 441-43, 629-30, 896-97, 966-67.  The ALJ was required to determine which opinion was better supported by the record as a whole, and was required to credit one opinion over another. The ALJ properly

23

rejected the opinion of the treating physicians and credited the opinion presented

by a non-examining physician; this decision was supported by substantial

evidence. See, Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 362 (3d Cir. 2011)

(a non-examining state agency physician opinion may constitute substantial

evidence where that opinion "was properly considered by the ALJ"). In sum, the

ALJ's evaluation of the conflicting medical opinions was supported by the

administrative record as a whole.

D.     **Vocational Expert Testimony**

Lastly, Arnold contends that the vocational expert testimony at step five

does not constitute substantial evidence.  More precisely, Arnold argues that the

position of surveillance system monitor exceeds the mental reasoning abilities of

simple, routine, repetitive tasks, and that she could not work as a bakery worker

due to her Hepatitis C.

The ALJ did not err in finding that Arnold could work as a bakery worker

despite her positive tests for Hepatitis C.  Arnold has presented no evidence or

argument as to why an individual with Hepatitis C would not be able to work as a

baker.  Furthermore, unlike other forms of hepatitis, Hepatitis C "'is not spread by

. . . coughing or sneezing [or] through food or water.' Thus, Hepatitis C is logically

not an impediment to obtaining a job in the food service industry." Rice v. Colvin,

2:13-CV-204, 2014 WL 4085023, at *5 (E.D. Tenn. Aug. 18, 2014) (quoting

24

United States Centers for Disease Control, *Hepatitis C FAQs for the Public*, *available to* www.cdc.gov/hepatitis/c/cfaq.htm# cFAQ81).  Because Hepatitis C is usually only spread when blood from an infected individual enters the body of another by through-the-skin contact, safety regulations governing the operation of food service establishments is sufficient to prevent the spread of Hepatitis C. Consequently, there is no reason why an individual afflicted with Hepatitis C cannot work as a bakery worker.

Furthermore, Arnold can also work as a surveillance system monitor.  The Dictionary of Occupational Titles ("DOT") provides descriptions of numerous jobs that exist in the national economy, and allows determinations as to what jobs exist that a claimant could perform.  See, Boone v. Barnhart, 353 F.3d 203, 206 (3d Cir. 2004).  Every entry for a job within the DOT includes a reasoning development code that runs on a scale from one to six.  Dictionary of Occupational Titles, 4th Ed (2001), App. C.  The position of system surveillance monitor has a reasoning development level 3, which requires "apply[ing] commonsense understanding to carry out instructions in written, oral, or diagrammatic form."  Id.

The ALJ did not err for two reasons.  First, the vocational expert stated that his testimony was consistent with the DOT, indicating that there is no apparent conflict between a level 3 reasoning development requirement and a limitation to simple, routine, repetitive, one-to-two step tasks.  Tr. 95-96.  Second, a limitation

of performing only simple, routine, repetitive, one-to-two step tasks is not

inconsistent with an ability to "apply commonsense understanding to carry out

instructions[.]"  See, Geiser v. Astrue, 4:10-cv-1973, 2011 WL 3163219, at *12

(M.D. Pa. July 24, 2011) (holding that GED Level 3 jobs are not "precluded by the

limitation of 'simple, routine, repetitive tasks.'"); Clawson v. Astrue, CIV.A. 11-

294, 2013 WL 154206, at *6 (W.D. Pa. Jan. 15, 2013).  Even assuming that the

ALJ erred in accepting the vocational expert's testimony as to Arnold's ability to

work as a surveillance system monitor, such error would be harmless because the

vocational expert correctly testified that Arnold could perform work as a bakery

worker.

## Conclusion

A review of the administrative record reveals that the decision of the

Commissioner is supported by substantial evidence.  Pursuant to 42 U.S.C. §

405(g), the decision of the Commissioner is affirmed.

An appropriate Order will be entered.